In re Robert BAHARA and Elaine
Bahara, Debtors.

In re Eugene BRIZER and Roberta
Brizer, Debtors.

Nos. 3:CV–96–104, 3:CV–96–102.

United States District Court,
M.D. Pennsylvania.

March 13, 1998.

Stephen G. Bresset, Stroudsburg, PA, for Debtors.

George E. Clark, Jr., Scranton, PA, for First Nat'l Bank of Jermyn.

## MEMORANDUM

VANASKIE, District Judge.

The above-captioned matters are before this Court on appeals taken on behalf of Eugene and Roberta Brizer (the Brizers) and Robert and Elaine Bahara (the Baharas) from an Order of the Bankruptcy Court for this District entered on October 12, 1995. In this Order, Bankruptcy Judge Thomas sustained the objection of the First National Bank of Jermyn (Bank) to the reorganization plans submitted on behalf of the Brizers and Baharas (referred to herein collectively as the "debtors"); overruled the debtors' contention that their indebtedness to the Bank

had been discharged by the Bank's modification of the obligations of the debtors' co-obligors; granted the Bank's motion to convert the proceeding to Chapter 7, subject, however, to the right of the debtors to submit amended reorganization plans; and granted the Bank relief from the automatic stay provision of the Bankruptcy Code as to certain commercial property that secured part of the debtors' obligations to the Bank. The focus of the debtors' argument on appeal is Judge Thomas' determination that the debtors' obligation to the Bank had not been discharged by virtue of a Loan Modification Agreement pursuant to which the Bank released the debtors' co-obligors. Because the October 12, 1995 Opinion left unresolved substantial questions as to the effect of the Loan Modification Agreement on the debtors' obligations to the Bank in connection with the 1979 loan, the bankruptcy court Order of October 12, 1995 will be affirmed in part, reversed in part, and this matter will be remanded to the bankruptcy court for further proceedings consistent with this Memorandum and Order.

## I. BACKGROUND

This litigation arises out of the failure of a meat processing business known as M. Brizer & Co., which was owned as a partnership by Eugene Brizer, Robert Bahara, and Edward Kubecki. In November of 1979, the Bank effectively extended a $650,000 loan to M. Brizer & Co.[1] The Bank also required that the partners of M. Brizer & Co., along with their spouses, execute a mortgage for certain commercial property (Exhibit 3), a "Bond Accompanying a Mortgage" (Exhibit 2), and an "Industrial Revenue Bond Guaranty" (the "Guaranty") (Exhibit 1). The Guaranty has three provisions particularly pertinent to the matters and issues raised here. First, the liability of the guarantors was "unconditional" and was not to be impaired by "[a]ny renewal or extension which may be made (with or without [the guarantors'] knowledge or consent) of the time of payment of the [Industrial Revenue] Bond, or of

---

1. The vehicle for this financing was the issuance of an Industrial Revenue Bond by the Wilkes-Barre Industrial Development Authority.

the time for performance by any party obligated thereto of any of the terms and provisions of the Bond." (*Id.* ¶ 3(a).) Second, the guarantors agreed that the Bank could pursue them without exhausting any remedy or claim against M. Brizer & Co. Finally, the guarantors were "jointly and severally liable under this Guaranty." (*Id.* ¶ 8.)

In May of 1987, the Bank made a second loan in connection with the business of M. Brizer & Co. This loan was in the amount of $200,000. The promissory Note was signed by not only the debtors and the Kubeckis' but also the Kubeckis' children.[2] This indebtedness was secured by mortgages on each of the personal residences of the Brizers, Baharas, the Kubeckis, and the Kubeckis' children.

M. Brizer & Co. last made payment on the $650,000 loan, listed by the Bank as No. 65250, on September 4, 1987. At that time, the principal balance due was $403,962.63.

Payments on the $200,000 loan, listed by the Bank as No. 82114, were also discontinued in September of 1987. At that time, the principal balance due was $184,958.12.

In November of 1988, the Bank confessed judgment in the amount of $650,000 against the debtors and the Kubeckis on the confession of judgment clauses in the 1979 Guaranty and the Bond Accompanying the Mortgage. In December of 1988, the Bank confessed judgment for $200,000 against the debtors, the Kubeckis and the Kubeckis' children pursuant to the warrant of attorney contained in the 1987 Note. Efforts to strike the judgments were unsuccessful. *See First Nat'l Bank of Jermyn v. Bahara,* 539 Pa. 153, 650 A.2d 1060 (1994) *(per curiam )* (Cappy, J., dissenting).[3]

While the litigation over the confessed judgments was pending, the Bank sought to negotiate loan modification agreements with the debtors and the Kubeckis. Although the Bank reached an agreement with the Kubeckis, it was unable to do so with the debtors. In order to avoid foreclosure on their personal residences, the debtors filed Chapter 11 proceedings on June 12, 1992.

On June 16, 1992, Edward and Stella Kubecki executed the Loan Modification Agreement with the Bank. Essentially, this agreement released the Kubeckis and their children from all prior obligations to the Bank in exchange for a $6,000 down payment by the Kubeckis *and* a promissory note for $127,000 executed by the Kubeckis and secured by a mortgage on the Kubeckis' residence. In essence, the Kubeckis agreed to pay the Bank $133,000, re-mortgaged their residence, which had been security for the 1987 Note, and in return received a discharge of their obligations on the 1979 Guaranty and the 1987 Note as well as a release of their children's liability to the Bank. (Exhibit 9.) An amendment to the Loan Modification Agreement, in which the Bank, *inter alia*, purported to expressly reserve all claims against the debtors, was executed in September of 1992. (Exhibit 10.)

During the course of the bankruptcy proceedings, the Bank filed a proof of claim as to only the 1979 loan.[4] Debtors argue that their obligations under both the 1979 Guaranty and the 1987 Note were discharged as a result of the Bank impermissibly releasing the Kubeckis, the Kubeckis' children, and their mortgages without the debtors' consent.

## II. DISCUSSION

### A. Standard of Review

■ In reviewing bankruptcy court decisions, questions of law are subject to plenary

---

2. The Kubeckis' children signing the Note were Francis Kubecki and Rose Kubecki, his wife, and Mary Colleen Kubecki. Although Rose Kubecki is only a daughter-in-law to the Kubeckis, she will be included in the designation of "Kubeckis' children" for the purposes of this Memorandum.

3. The factual recitation in the text concerning the confessions of judgment is drawn from Justice Cappy's dissenting opinion.

4. As explained by Judge Thomas, because the Bank had liens on the debtors' residences as a consequence of the mortgages executed in connection with the May 1987 loan, the failure to file a proof of claim was not fatal to the Bank's ability to proceed against the residences. However, the Bank forfeited any part of their claim against the debtors on the 1987 loan beyond the value of their homes.

review while questions of fact require application of the clearly erroneous standard. Fed.R.Bankr.8013 ("Findings of fact will be upheld unless clearly erroneous."); *In re Lilley*, 91 F.3d 491, 494 (3d Cir.1996). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire record evidence is left with the definite and firm conclusion that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Whether a plan has been proposed in good faith is a question of fact subject to the clearly erroneous standard, while the legal standard applicable to good faith determinations is a question of law subject to plenary review. *See In re Goddard*, 212 B.R. 233, 237 (D.N.J.1997).

In this case, any decision as to the debtors' proposed reorganization plan is largely dependent upon whether the debtors' indebtedness to the Bank has been discharged, in whole or in part, as a result of the Loan Modification Agreement between the Bank and the Kubeckis. The bankruptcy court separately considered the impact of that agreement on the 1979 Guaranty and the 1987 Note.[5] As to the 1979 Guaranty, Judge Thomas held that the debtors had waived any defense of discharge by agreeing in the Guaranty that their liability would not be affected by any modification of the terms of the Bond. As to the 1987 Note, the bankruptcy court found that the debtors had failed to carry their burden of showing the extent to which the Loan Modification Agreement impaired their rights of contribution against those who were released by the Bank. The

Bankruptcy Court's rulings as to the 1979 Guaranty and 1987 Note will be addressed *seriatim*.

### B. The 1979 Guaranty

Under the 1979 Guaranty, the debtors and the Kubeckis *unconditionally* guaranteed payment to the Bank of the principal and interest on the $650,000 indebtedness.[6] The liability of the debtors and the Kubeckis was not dependent upon the Bank's exhaustion of remedies against M. Brizer & Co. Nor could their liability be impaired by any modification of the terms of the Industrial Revenue Bond that was the subject of the 1979 Guaranty. Further, liability under the 1979 Guaranty was joint and several, meaning, of course, that the Bank could proceed against one or more of the guarantors separately, or all of them together, at the Bank's option, for the entire amount due and owing.

These aspects of the 1979 Guaranty are undisputed. Nor is there any contention in this case that the Bank took action vis a vis the principal debtor that vitiated its right to proceed under the 1979 Guaranty. On the contrary, the entry of judgment against the Kubeckis and the debtors under the 1979 Guaranty has been sustained. *See First Nat'l Bank of Jermyn v. Bahara*, 539 Pa. 153, 650 A.2d 1060 (1994) (*per curiam*).

■ What this case does concern is the relationship between the debtors, on the one hand, and the Kubeckis, on the other, as *co-sureties*. In *Keystone Bank v. Flooring Specialists, Inc.*, 513 Pa. 103, 518 A.2d 1179 (1987), the Pennsylvania Supreme Court explained: "Where ... there are several sure-

---

5. Although the debtors contend that the Bank regarded both transactions as "one unified obligation," there is no support in the record for this assertion. (Debtor's Brf. (Dkt. Entry 4) at 2.) To the contrary, the record shows that each transaction was given a separate loan number and payments were applied to each indebtedness. In addition, the Bank separately accrued interest as to each indebtedness. Judge Thomas was thus fully justified in separately addressing the discharge issue as to the 1979 Guaranty and 1987 Note.

6. Although the term "guarantee" is used, the relationship established by the 1979 guarantee was actually one of suretyship. *See First Nat'l*

*Consumer Discount Co. v. McCrossan*, 336 Pa.Super. 541, 547–48, 486 A.2d 396 (1984). A suretyship arrangement typically involves a tripartite relationship in which a creditor is entitled to performance by a principal debtor, or, if the debtor defaults, the debtor's surety. Ballentine's Law Dictionary 1244 (3d Ed.1969) (defining suretyship as "[a] contractual relationship, resulting from a primary, original, absolute, and unconditional engagement, whereby one person, the surety, engages to be answerable for the debt, default, or miscarriage of another, the principal."). In this case, the debtors and the Kubeckis were, essentially, the sureties of M. Brizer & Co. in relation to the 1979 Guaranty.

ties for the principal's unpaid debt, each surety owes to his co-sureties a duty to pay his proportional share of their common debt." *Id.* at 115, 518 A.2d 1179. Upon default by the principal in a suretyship, each surety becomes a principal for his or her pro rata share and remains a surety for the balance of the debt. *Id.* at 116, 518 A.2d 1179 ("[W]here there are several co-sureties each of them is in legal effect, as against the others, a principal for his proportion of the debt and a surety for the rest of it."). Accordingly, in this case, the Baharas, Brizers and Kubeckis were each liable as principals to pay their proportionate share of the indebtedness to the Bank on the 1979 Guaranty, and each remained liable as sureties for their co-guarantors' proportionate shares. The debtors contend that, as a result of the Loan Modification Agreement, the Kubeckis have been released by the Bank for less than their proportionate share of liability. In other words, the debtors assert that they are being held responsible for more than their proportionate share of liability under the 1979 Guaranty.

The debtors' argument is based on the proposition that if a creditor discharges a principal in a manner that prejudices the rights and interests of the surety, the surety will be discharged from performing. *See Keystone Bank v. Flooring Specialists, Inc.,* 513 Pa. 103, 114, 518 A.2d 1179 (1987); *see also First Nat'l Bank of Irwin v. Foster,* 291 Pa. 72, 75, 139 A. 609 (1927) ("The uniform rule is that where a creditor releases the principal from payment of a debt he thereby releases the surety entirely, or, if he releases the principal from a part only, the surety is released pro tanto."). Further, where a creditor releases the principal's collateral, the surety is discharged to the extent that such collateral would have reduced his obligation. *See Foster,* 291 Pa. at 75, 139 A. 609 ("Likewise, if the creditor holds collateral security for the debt, the release or surrender of the collateral will operate as a release

or discharge of the surety from liability in so far as the security would have produced sufficient funds to pay the debt in whole or in part."); *Park Bank v. Kleman,* 278 Pa. 165, 169, 122 A. 221 (1923) ("Of course, when a creditor has in his hands the means of paying a debt, and does not use it, but surrenders, without reason, securities held, a surety will be discharged pro tanto . . . ."). These general rules apply with equal force to the relationship between co-sureties. *See Keystone Bank,* 513 Pa. at 116, 518 A.2d 1179 ("In the same way that a surety can be discharged from his obligation to the creditor because of transactions between the creditor and the principal debtor which prejudice the surety's rights, so too can one surety be discharged because of prejudicial transactions between the creditor and another surety for the same debt.") [7]

■■■■■ But the fact that the Bank may have released the Kubeckis from liability under the 1979 Guaranty for less than their proportionate share does not, contrary to the debtors' assertion, serve to discharge the debtors from *all* liability under the 1979 Guaranty. As between the sureties, it must be emphasized that the Kubeckis were considered a principal for their proportionate share of the debt. The debtors are only sureties for the Kubeckis' proportionate share of the underlying obligation. Actions taken by a creditor with respect to one of several co-sureties do not provide a basis for discharging the other co-sureties of their liability *as principals* for their proportionate share of the debt. As noted by the Pennsylvania Supreme Court in *Keystone Bank:*

[I]n the case of co-sureties, the equitable principles of suretyship are observed, and accordingly, each must be treated as between himself and his co-sureties as a principal for the fraction of the debt which he ought to pay, and as a surety for the remainder. *If the creditor by any dealings with one co-surety impairs the suretyship rights of other co-sureties. they will be*

---

**7.** It should be noted that the same principles apply even if the focus of the analysis is on the obligation arising under the Bond Accompanying the Mortgage executed by the debtors and the Kubeckis. They plainly signed the Bond as accommodation makers. As explained *infra,* the rules pertaining to liability of sureties apply with equal force to accommodation makers. Hence, the analysis remains the same irrespective of whether the impact of the Loan Modification Agreement is considered with respect to the Bond or the Guaranty.

*discharged from such a proportion of the debt as they would equitably have been entitled, on payment of it, to throw upon the co-surety with whom the inequitable dealings have been had.*

*Keystone Bank,* 513 Pa. at 116, 518 A.2d 1179 (quoting 10 L. Simpson, Handbook on the Law of Suretyship § 1263, at 840 (1950)) (emphasis added). Thus, where one co-surety is discharged from his or her obligation, the effect on the other co-sureties may be to relieve them from their surety obligation for the discharged surety's proportionate share of the debt, but not for their liability for the fraction of the debt for which they are liable as principals.[8] In short, action taken by the creditor with respect to one co-surety cannot eliminate the other co-sureties' indebtedness for their proportionate share of the total debt owed to the creditor.

The Pennsylvania Commercial Law has codified the foregoing common law grounds for discharge of a surety. *See* 13 Pa.C.S.A. § 3606.[9] The Pennsylvania Supreme Court has determined that a surety's right of contribution is protected by § 3606. *Keystone*

*Bank,* 513 Pa. at 116, 518 A.2d 1179. Under that section:

(a) General Rule.—The holder discharges any party to the instrument *to the extent that without the consent of such party* the holder:

(1) *without express reservation of rights releases or agrees not to sue any person* against whom the party has to the knowledge of the holder a right of recourse or agrees to suspend the right to enforce against such person the instrument or collateral or otherwise discharges such person, except that failure or delay in effecting any required presentment, protest or notice of dishonor with respect to any such person does not discharge any party as to whom presentment, protest or notice of dishonor is effective or unnecessary; or

(2) unjustifiably *impairs any collateral* for the instrument given by or on behalf of the party or any person against whom he has a right of recourse.

13 Pa.C.S.A. § 3606 (Purdon's 1984) (emphasis added).[10]

8. There are at play in this matter two analytically distinct issues. The first concerns the impact of the Bank's release of the Kubeckis from liability under the 1979 Guaranty. The second issue pertains to the effect of the Bank's release of collateral that may have secured the Kubeckis' obligation. In the latter situation, the co-sureties must prove the extent to which the discharge of the collateral impaired their ability to seek contribution from the co-surety in the event that they are required to pay the entire debt. As explained in *Keystone Bank,* "if the creditor releases collateral obtained from one of several co-sureties to secure the debt, such release can impair the other sureties' right to resort to such collateral to enforce their rights of contribution, and if the release has such an effect, the other co-sureties will be entitled to a *pro tanto discharge* of their obligations." *Keystone Bank,* 513 Pa. at 116–17, 518 A.2d 1179 (emphasis added). The distinction between impairment of collateral securing a co-surety's obligation, thereby diminishing the amount that may be recovered in a contribution action, versus a release of a co-surety that destroys contribution rights, is vital to an understanding of these defenses available to sureties. Where one co-surety is personally released in a manner that destroys the other surety's right of contribution, then in effect a principal has been released from his or her obligation. As such, the overall obligation is reduced by the released co-surety's pro rata share of the debt. Where collateral is released, then the question becomes

whether a creditor has impaired the ability of other co-sureties to seek contribution from the co-surety whose property was released. In such a situation, the impairment of the collateral would *determine the extent of the release,* with the ceiling being the pro rata share of the co-surety whose collateral has been released.

9. Many of the statutory provisions concerning commercial paper have been amended subsequent to the institution of the debtors' bankruptcy case. Pennsylvania law provides that civil actions be determined according to the law in existence at the time the action was instituted, not according to subsequent changes in the law. 1 Pa.C.S.A. § 1976.

10. Subsection (b) of § 3606 provides that an express reservation of rights against a party with a right of recourse preserves that party's right of recourse against others. In this case, the debtors would have a right of recourse against the Kubeckis for the Kubeckis' proportionate share of the indebtedness under the 1979 Guaranty. If the Bank failed to reserve its rights to proceed against the debtors, and no other provision of the 1979 Guaranty waives the defenses afforded under § 3606(a)(1), then the debtors' obligation to the Bank would be reduced by the Kubeckis' share of indebtedness under the 1979 Guaranty.

In terms of subsection (a)(1), the bankruptcy court found, and the parties seemingly agreed, that an express reservation of rights in the Loan Modification Agreement was unnecessary in light of the provisions of the 1979 Guaranty to the effect that the guarantors' liability would not be impaired by any modification, extension or renewal of the terms of the Bond. In other words, Judge Thomas determined that each guarantor agreed to be liable for the entire debt regardless of the Bank's release of a co-guarantor. Therefore, the bankruptcy court determined that subsection (a)(1) was not applicable to this situation. Reliance on the waiver provisions in the 1979 Guaranty, however, was misplaced. The 1979 Guaranty provided that the liability of the debtors would not be "impaired or affected" by any renewal, extension, forbearance or modification of the underlying Industrial Revenue Bond, not of the 1979 Guaranty itself. There is no provision in the 1979 Guaranty that constitutes a consent by one co-surety to the release of another. Accordingly, the bankruptcy court's ruling with respect to the objection to the Bank's proof of claim on the 1979 loan cannot stand.

This matter will be remanded to the bankruptcy court for purposes of re-considering the § 3606(a)(1) defense. Specifically, the bankruptcy court must consider whether the Bank's subsequent attempt to reserve its rights in a document drafted after the Loan Modification Agreement was a valid reservation under subsection (a)(1). If so, then there would be no discharge of the debtors' obligation to the Bank under § 3606(a)(1).

It must be emphasized that subsection (a)(1) relates to the release of an individual from liability that effectively destroys a co-surety's right of recourse against the released party. An express reservation of rights against the non-discharged parties is presumed to preserve rights of recourse. This explains why a non-discharged co-surety obtains a discharge of his obligation for any amount due in excess of his proportionate share of the debt, but not for his proportionate share of the debt. The rule is equitable in nature, intending to maintain the status quo among co-sureties where a creditor agrees to release one of the co-sureties. The Kubeckis, as co-sureties, were considered to be principals for their portion of the liability on the 1979 loan and co-sureties for balance. If they were released without the debtors' right of recourse having been preserved, then the debtors would be entitled to a corresponding release relative to the Kubeckis' pro rata share of the debt, *i.e.,* the share of the debt for which the debtors are secondarily liable as sureties, not as principals. *Keystone Bank,* 513 Pa. at 116, 518 A.2d 1179.

In a similar case, *Provident Bank v. Gast,* 57 Ohio St.2d 102, 386 N.E.2d 1357 (1979), the Supreme Court of Ohio considered a situation in which a creditor released two out of four guarantors from their obligations under a Note. The court considered whether such a discharge totally released the other co-obligors or merely released them to the extent of their right of contribution from the released parties. *Id.* 386 N.E.2d at 1358. The case turned upon the court's interpretation of an Ohio statute that mirrors § 3606. Because the transaction involved the rights of sureties, the court considered the principles of surety law. *Id.* at 1359. The court noted that the common law rule required that upon the release of a co-surety, the other co-sureties were released to the extent of the contributive share of the released co-surety. *Id.* at 1360. The court held that the "to the extent that" language found in subsection (a) reflected the legislature's intent to follow the common law rule of limiting a co-surety's discharge to the released co-surety's principal share of the debt, as opposed to an outright discharge of the entire debt. *Id.* The court succinctly summarized its analysis of subsection (a)(1):

> In conclusion, when one of several co-guarantors on a note is completely released from his obligation by the holder, without an express reservation of rights, the release operates to discharge the remaining co-guarantors ... *to the extent of their right to contribution from the co-guarantor so released.*

*Id.* at 1361.

Likewise in this case, if the debtors are entitled to assert the subsection (a)(1) defense, they are *not* entitled to a total dis-

charge of their obligation under the 1979 Guaranty. Rather, the debtors would be entitled under subsection (a)(1) to a release from liability under the 1979 Guaranty only to the extent of the Kubeckis' proportionate share of the debt owed under the 1979 Guaranty. This is the most relief that the debtors could obtain.

The subsection (a)(1) defense is available where the holder discharges a co-surety without expressly reserving rights against the debtors. The Loan Modification Agreement does not contain such an express reservation of rights. As noted above, however, an amendment to the Loan Modification Agreement executed in September of 1992 did contain an explicit reservation of rights. In view of his determination that the debtors had waived in advance the consequences of a modification of the Kubeckis' liability, Judge Thomas did not address the efficacy of this reservation of rights. On remand, he will now have to address this issue. If this reservation was not effective, then the debtors are entitled to a discharge in the amount of the Kubeckis' proportionate share of the underlying debt.[11] If the reservation was effective, then the subsection (a)(1) defense is not available to the debtors, and the bankruptcy court will have to determine whether the debtors are entitled to any relief under the impairment of collateral defense in § 3606(a)(2).[12]

It is unlikely that the debtors are entitled to the impairment of collateral defense under subsection (a)(2) in relation to the 1979 Guaranty. This defense applies where the co-surety is obligated to pay more than his proportionate share of the underlying debt and the creditor has taken some action with respect to collateral otherwise available to the cosurety to enforce contribution rights against other co-sureties. Under § 3606, the co-surety bears the burden of demonstrating that the creditor's alleged impairment of the collateral has resulted in the co-surety being liable for more than its pro rata share, i.e., the creditor's action in regard to collateral has impaired a co-surety's ability to recover full contribution for any amount in excess of the co-surety's proportionate share of the debt. See National Bldg. & Sav. Ass'n v. Fink, 182 Pa. 52, 59, 37 A. 1009, 1010 (1897); see also Gens v. Resolution Trust Corp., 112 F.3d 569, 577 n. 14 (1st Cir.) ("Although we have found no Massachusetts case precisely on point, the clear majority trend among U.C.C. jurisdictions is to require the accommodation maker to prove actual loss from the impairment." (collecting cases)), cert. denied, —— U.S. ——, 118 S.Ct. 335, 139 L.Ed.2d 260 (1997); In re Alcock, 50 F.3d 1456, 1462 (9th Cir.1995) ("A clear majority of state courts place the burden on the guarantor to prove actual prejudice and limit the discharge to the extent of the impairment demonstrated."); see also FDIC v. Blue Rock

---

11. It would appear that the Kubeckis' proportionate share of the debt is one-third, but that determination will be reserved for Judge Thomas.

12. Another issue for the bankruptcy court to determine is whether the protection of both defenses under § 3606 was waived by the language in the 1979 Guaranty, which states that the debtors and the Kubeckis "unconditionally guarantee[d]" payment. (Exhibit 1, ¶ 1(a).) In this regard, the Third Circuit has defined an unconditional Guaranty as " 'one whereby the guarantor agrees to pay or perform a contract on default of the principal without limitation. It is an absolute undertaking to pay a debt at maturity or perform an agreement if the principal does not pay or perform.' " Fireman's Fund Ins. Co. v. Joseph J. Biafore, Inc., 526 F.2d 170, 174 (3d Cir.1975) (quoting Continental Leasing Corp. v. Lebo, 217 Pa.Super. 356, 363, 272 A.2d 193, 197 (1970)); see also Security Pacific Nat'l Trust v. Philadelphia Auth. for Indus. Dev., No. 88–3637, 1990

WL 156595, at *3 (E.D.Pa. Oct. 9, 1990) ("The clear and unambiguous language of the 1986 Guaranty waived Defendant's defense of impairment of collateral."); Istituto Mobiliare Italiano v. Motorola, Inc., 689 F.Supp. 812, 817 (N.D.Ill. 1988) ("the defense of impairment of collateral is not available to one who has given an unconditional guarantee of payment ."); First Nat'l Consumer Discount Co. v. McCrossan, 336 Pa.Super. 541, 547, 486 A.2d 396, 400 (1984) (where Guaranty agreement was absolute and unconditional, sureties not discharged because creditor failed to perfect security interest). But see United States v. Vahlco Corp., 800 F.2d 462 (5th Cir.1986) ("The suretyship defenses arise by operation of law, and absent an express waiver, even an absolute and unconditional guarantor may assert them."); Langeveld v. L.R.Z.H. Corp., 74 N.J. 45, 376 A.2d 931, 935 (1977) (finding that "unconditional guarantee" did not waive suretyship defenses). The bankruptcy court must determine whether the debtors' unconditional guarantee resulted in a waiver of their suretyship defenses.

*Shopping Ctr., Inc.,* 676 F.Supp. 552, 558 (D.Del.1987) (requiring proof "by a preponderance of the evidence that the collateral securing the Bond was unjustifiably impaired"), *aff'd,* 849 F.2d 599 (3d Cir.1988); *cf.* 13 Pa.C.S.A. § 3605(f) (Purdon's Supp.1997) (placing the burden of proof upon the party claiming prejudice as a result of impairment of collateral).[13]

The debtors' burden in relation to the 1979 Guaranty is substantial. When the 1979 Guaranty was executed, the debtors and the Kubeckis did not pledge any collateral to secure it. Therefore, any impairment of collateral argument as to the 1979 Guaranty must rely upon the confession of judgment that the Bank obtained in 1988 under the provisions of the 1979 Guaranty. The debtors have failed to present any evidence as to the priority that the lien resulting from this judgment had in relation to the Kubeckis' property. Given the lack of evidence on this issue, the debtors appear to have failed to meet their burden of demonstrating that the Bank's release of the Kubeckis' property from the lien of the judgment obtained under the 1979 Guaranty resulted in any impairment of collateral.

In any event, it must be repeated that the maximum amount of the release that may be obtained under § 3606 is the amount of the Kubeckis' proportionate share of the 1979 obligation. In terms of subsection (a)(1), if the Kubeckis were released under the 1979 Guaranty without a valid reservation of rights, then the debtors are entitled to a reduction of the debt under the 1979 Guaranty to the extent of the Kubeckis' proportionate share. If such a determination is made, then the bankruptcy court need not consider the extent to which the Bank improperly impaired the collateral of the Kubeckis as such impairment would not lead to any further reduction in the debtors' obligations beyond the Kubeckis' proportionate share. *See Keystone Bank,* 513 Pa. at 117, 518 A.2d 1179.

If it is determined that the reservation of rights in the amendment was effective, then the bankruptcy court may rely upon its previous determination that the debtors failed to meet their burden under subsection (a)(2) as to the 1987 Note. In his opinion, Judge Thomas only considered the impairment defense as it related to the 1987 Note. It would appear, however, that his analysis of the impairment defense in terms of the 1987 Note would apply with equal force to the 1979 Guaranty. In this regard, his conclusion that the debtors failed to carry their burden of showing an impairment of collateral is not clearly erroneous. Thus, on remand, Judge Thomas may elect to apply his previous analysis of the subsection (a)(2) defense as to the 1987 Note to the 1979 Guaranty.

## C. The 1987 Note

■ The 1987 promissory Note had the following language: "We promise to pay." Under 13 Pa.C.S.A. § 3118(5) (Purdon's 1984):

> Unless the instrument otherwise specifies two or more persons who sign as maker, acceptor or drawer or indorser and as a part of the same transaction are jointly and severally liable even though the instrument contains such words as "I promise to pay."

13. The distinction between impairment of collateral of a principal versus impairment of the collateral of a co-surety is important. In the case of impairment of collateral of a principal, the surety remains liable for the full extent of the principal's debt. If the surety pays the entire debt but the creditor has released the principal's collateral, the ability of the surety to collect the *entire* debt from the principal may be impaired. On the other hand, where a creditor releases collateral of a co-surety, the extent of the impairment is dramatically different. As noted, upon default, each co-surety is considered a principal for his or her proportional share and a surety for the remainder of the debt. If a co-surety's collateral is released, the other sureties would only have a right of recourse against the surety whose collateral was released to the extent of that surety's proportional share of the debt. Because a co-surety cannot seek to require another co-surety to contribute more than his or her proportionate share, likewise, the impairment of collateral defense cannot be used to discharge a debt beyond a co-surety's proportional share of the debt for which he or she is considered a principal. Thus, the fact that the Kubeckis' collateral may have yielded the Bank more than the Kubeckis' proportionate share of the underlying debt is irrelevant to the amount for which the debtors are to be held liable as principals.

*Id.*[14] Given the language of the 1987 Note and this statutory authority, it is clear that the individuals who signed the 1987 Note (debtors, the Kubeckis and the Kubeckis' children) were jointly and severally liable for the $200,000 borrowed under the Note.

Relying upon the *Restatement of Contracts,* Judge Thomas found that the debtors, the Kubeckis, and the Kubeckis' children were co-promisors under the 1987 Note. (Order and Opinion dated Oct. 12, 1985, at 8.) The debtors have not challenged this finding on appeal.

In order to be able to call upon a § 3606 defense, a party must demonstrate that he signed the Note as an accommodation party as opposed to a co-borrower. *See Gens v. Resolution Trust Corp.,* 112 F.3d 569, 576 (1st Cir.) (citing James A. White & Robert S. Summers, *Uniform Commercial Code* §§ 13–16 (3d Ed.1988)), *cert. denied,* —— U.S. ——, 118 S.Ct. 335, 139 L.Ed.2d 260 (1997); *FDIC v. Blue Rock Shopping Ctr., Inc.,* 766 F.2d 744, 749 (3d Cir.1985) ("We agree with the *Unum* Court that 3–606 is meant to apply only to parties who act as sureties. We hold, however, that a co-maker who signs a Note to accommodate the primary obligor and who has a right of recourse against the primary obligor is a surety who can assert the defense of 3–606(1)(b)."); *United States v. Unum,* 658 F.2d 300, 304–05 (5th Cir.1981) (holding that 3–606 extends to sureties, but not co-makers). Research has failed to disclose any Pennsylvania case addressing the question of whether the § 3606 defenses are available to a co-maker. The Pennsylvania Superior Court, however, has suggested that § 3606 merely codifies the defenses available to a *surety* under common law, not the defenses available to a co-maker. *Cf. First Fed. Sav. & Loan Ass'n of Pittston v. Reggie,* 376 Pa.Super. 346, 353 n. 2, 546 A.2d 62 (1988) ("The Uniform Commercial Code as enacted in Pennsylvania codifies the common law grounds for discharge of a surety in relation to commercial paper.") (citing 13 Pa. C.S.A. § 3606 (Purdon 1984)). Under the Third Circuit's interpretation of 3–606 of the Uniform Commercial Code, the debtors are unable to assert a defense under § 3606 in relation to the 1987 Note because they were co-makers of the Note, as opposed to sureties. *Blue Rock,* 766 F.2d at 749.[15] Therefore, the bankruptcy court's determination regarding the 1987 Note will be affirmed as the debtors may not assert any defense under § 3606.[16] Thus, the determination that

---

**14.** This provision was repealed and replaced by 13 Pa.C.S.A. § 3116(a) (Purdon's Supp.1997), which provides:

> Joint and Several Liability.—Except as otherwise provided in the instrument, two or more persons who have the same liability on an instrument as makers, drawers, acceptors, indorsers who indorse as joint payees, or anomalous indorsers are jointly and severally liable in the capacity in which they sign. *Id.* Thus, the new amendment would not require a different outcome.

**15.** The mere fact that a party signs a note as a co-maker does not foreclose the possibility that such a person is in reality a surety or an accommodation maker. Under the Uniform Commercial Code, an accommodation party "is one who signs the instrument in any capacity for the purpose of lending his name to another party to it." 13 Pa.C.S.A. § 3415(a) (Purdon's 1984). As noted by the Pennsylvania Superior Court in considering the potential liability of a defendant on a note signed as a co-maker: "While it is true that [defendant] signed the note in the capacity of a co-maker it is also true that she signed her name for the purpose of lending her name to another party to it.... Therefore, we conclude that although [defendant] is a co-maker she is also an accommodation party." *See Philadelphia Bond*

& *Mortgage Co. v. Highland Crest Homes, Inc.,* 235 Pa.Super. 252, 258, 340 A.2d 476, 480 (1975); *see also First Federal Savs. & Loan Ass'n of Pittston v. Reggie,* 376 Pa.Super. 346, 352, 546 A.2d 62, 65 (1988) ("Rather, a person can be found to be a surety even if he or she signed the instrument as a co-maker agreeing to be jointly and severally bound.").

In this case, it appears that the Kubeckis' children were in effect signing the 1987 Note for the benefit of their parents. There is no evidence that the Kubeckis' children were benefitting from the 1987 Note or that they received any funds. Instead, it appears that the funds went to M. Brizer & Co., a partnership in which the Kubeckis' children did not have an interest. Although there may be some doubt concerning the capacity in which the Kubeckis' children signed that 1987 Note, no such doubt exists with regard to the debtors. It is clear that the debtors signed as co-makers with the Kubeckis. In any event, the debtors do not challenge Judge Thomas' determination that they were co-makers.

**16.** Even if an impairment of collateral defense under subsection (a)(2) was applicable, the debtors failed to carry their burden of proof. In this regard, the debtors failed to present sufficient

the Bank is secured to the extent of the combined worth of the debtors' homes, with no allowance for any unsecured amount beyond that, will be affirmed.[17]

### D. Failure to Confirm the Chapter 11 Plan

■ The debtors also claim that Judge Thomas improperly denied confirmation of their Chapter 11 plan. In reviewing the debtors' proposed plan, Judge Thomas stated:

> The Debtors offer a cram down in their plan of reorganization through the sale of over-valued machinery, equipment and commercial real estate without addressing the disposition of the Debtors' homes should the collateral be insufficient to satisfy the loan. The plan makes no provisions for unsecured or undersecured debt. Nevertheless, the court will not preclude the Debtors from attempting to present a confirmable plan consistent with this opinion.

(Opinion and Order dated Oct. 12, 1997, at 12.) As observed earlier, the debt under the 1979 Guaranty was substantial. Judge Thomas calculated the amount payable on the 1979 Guaranty to be $664,859.62, of which only $169,194.11 was secured by the commercial property.[18] The debtors' reorganization plan failed to account for the equity in their homes in relation to the unsecured indebtedness. Given the large unsecured debt coupled with the lack of any evidence pertaining

to the disposition of the debtors' residences, it cannot be said that Judge Thomas' denial of the Chapter 11 plan was clearly erroneous.[19] Because this matter is being remanded for further proceedings, however, the bankruptcy court order sustaining objections to the reorganization plan will be vacated. The bankruptcy court must reconsider any amended reorganization plan in light of its findings that are made in accordance with this Memorandum and Order.

### III. CONCLUSION

There are several issues which require remand to the bankruptcy court for consideration. First, the bankruptcy court must consider whether the "unconditional guarantee" language within the 1979 Guaranty waived the debtors' surety defenses under § 3606. Assuming that no such waiver occurred, then the bankruptcy court must determine whether the Bank properly reserved its rights under § 3606 as to the 1979 Guaranty. If the debtors did not waive their § 3606 defenses and the Bank failed to properly reserve its rights, then the bankruptcy court must reduce the Bank's claim on the 1979 loan by the Kubeckis' proportionate share of the indebtedness on that loan.[20] If the bankruptcy court determines that the Bank properly reserved its rights, then it *may* rely upon its previous determination that the debtors have failed to present evidence to support their impairment of collateral defense.[21]

---

evidence to suggest that any impairment of collateral occurred in relation to the 1987 Note. Therefore, the bankruptcy court properly rejected the debtors' subsection (a)(2) defense.

17. The bankruptcy court valued the Brizers' residence at $138,500 and the Baharas' residence at $148,000. No calculation was made, however, as to the amount of indebtedness under the 1987 Note.

18. Judge Thomas' calculation failed to take into account the consideration received by the Bank for the Kubeckis' release from their obligations, *i.e.*, $133,000 ($6,000 down payment and a $127,000 note and mortgage). The debtors have not raised this issue on appeal. The Bank, however, concedes that the debtors must be given credit for the consideration provided by the Kubeckis for their release. (Bank's Opp. Brf. (Dkt. Entry 5) at 8.) In light of remand, the debtors are not foreclosed from presenting the bankruptcy

court with arguments as to how the $133,000 received by the Bank from the Kubeckis should be applied to the outstanding obligations.

19. Debtors also contend that a Note for $200,000 signed on June 24, 1987 is not secured because the Elaine Bahara and Roberta Brizer did not sign the document. The Bank has agreed that the June 24, 1987 loan constitutes an unsecured debt. (Bank's Opp. Brf. (Dkt. Entry 5) at 9.) Therefore, this issue is moot.

20. It would appear that, at best, the claim on the 1979 Guaranty would be reduced by one-third, leaving a substantial amount still unsecured.

21. The Bank, of course, may obviate consideration of these issues by stipulating to reduce its claim against the debtors on the 1979 Guaranty by the Kubeckis' share of the amount found by Judge Thomas to be due and owing on the 1979 loan.

In terms of the 1987 Note, Judge Thomas' determination that the debtors were co-makers under the 1987 Note will be affirmed. Because the debtors were co-makers under the 1987 Note, as opposed to sureties, the impairment defenses under § 3606 are not available to them. Therefore, Judge Thomas' determination as to the 1987 Note will be affirmed.

As to the debtors' claim that their Chapter 11 plan should have been confirmed, Judge Thomas' refusal to confirm the plan is supported by the facts. In particular, the debtors failed to account for the disposition of their residences under the plan. Given the large amount of unsecured debt, the debtors' equity in their residences was crucial to a viable Chapter 11 plan. Because this matter is being remanded for further proceedings, however, the order sustaining objections to the plan will be vacated. The bankruptcy court should reconsider any amended reorganization plans in light of its findings that are made in accordance with this Memorandum and Order.